Congressional Record --- Senate
Proceedings and Debates of the 101st Congress, First Session
Tuesday, October 24, 1989

STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. MCCAIN (for himself, Mr. DECONCINI, Mr. BURDICK, Mr. COCHRAN, and Mr. INOUYE):

S. 1783. A bill to regulate Indian child protection and prevent child abuse on Indian reservations; to the Select Committee on Indian Affairs.

INDIAN CHILD ABUSE PREVENTION AND TREATMENT ACT

Mr. MCCAIN.

Mr. President, I rise today to introduce with Senator DECONCINI the Indian Child Abuse Prevention and Treatment Act. This bill would address one of the most devastating problems in Indian country by establishing mandatory reporting requirements for child abuse and neglect in Indian country. In February of 1989, the Special Committee on Investigations, a subcommittee of the Select Committee on Indian Affairs, held hearings which exposed many problems in the Bureau of Indian Affairs and the failure of the Federal Government to maintain its trust responsibility to American Indians. The most tragic example of the Federal Government's failures is the growing problem of child sexual abuse on Indian reservations. As cochairman of the Special Committee on Investigations I heard the heart-rending stories of the parents and families of these Indian children who were victimized by BIA teachers.

Child abuse is not unique to Indian reservations, by any means. National data collected by the American Humane Association reports an increase of 158 percent in all reported child abuse and neglect cases from 1976 to 1984, nationwide. The Federal Government's trust relationship with native American children is unique, however. This trust relationship is doubly important when it involves Indian children since these children cannot protect themselves. Each year hundreds of children are scarred by sexual abuse at the hands of those whom they trust-both in governmental facilities, such as schools and foster homes, and in the community. Little assistance has been provided by either the BIA or the Indian Health Service to treat the scars that result. These scars do not fade easily. An entire generation of children on the Hopi Reservation has been deeply scarred by the actions of one BIA teacher. Just last Friday, a young Hopi man, 18 years of age, committed suicide because of the burdens and guilt he had to shoulder *S13894 after having been sexually abused by the teacher years earlier. Before shooting himself in the head, this victim told his mother that he could not live with the shame. The injury to these children does not end with the end of the abuse. The children cannot forget. The community cannot forget. Countless other victims have felt the same pain and have been left to twist in the wind by a system that did not care. This cannot be tolerated. Sexual abuse not only destroys the lives of Indian children, it devastates the child's family and in close knit Indian tribes, it affects the entire community.

PLAINTIFF'S EXHIBIT 6

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

is a provision for the funding of treatment for child abuse victims.

The bill would establish mandatory reporting requirements for child abuse and neglect in Indian country. A violation of these requirements could result in a fine of up to $1,000. If a supervisor of a reporting party in any way inhibits or prevents them from making a report of child abuse or neglect they could be fined up to $1,000. Any person who makes a report of child abuse and neglect in "good faith" shall be immune from civil and criminal liability. The bill would create a central registry in the Bureau of Indian Affairs for reports of child abuse and neglect. It requires the BIA and IHS to investigate the moral character of individuals to be employed in those professions that would have regular contact with or control over Indian children. It would establish mininum standards of moral character for individuals to be employed in positions which have regular contact with or control over Indian children. Finally, the bill would amend the Victims of Crime Act, 42 U.S.C. 10601, to provide $10 million in grants to Indian tribes for the development of treatment programs for the victims of child sexual abuse on reservations.

I am very pleased to have worked with Senator MCCAIN in developing this important legislation and I urge my colleagues to support it so that we can attempt to put an end to the tragedy of sexual abuse of Indian children on reservations.

------

By Mr. PRYOR:

S. 1784. A bill to amend the Internal Revenue Code of 1986 to revise various civil penalties; to the Committee on Finance.

INTERNAL REVENUE CODE PENALTY REFORM ACT

Mr. PRYOR.

Mr. President, I stand today to introduce the Internal Revenue Code Penalty Reform Act.

In 1975 the Administrative Conference of the United States issued a report on the 64 penalties of the Internal Revenue Code. The report characterized the penalty structure of that day as "mind numbing." Fourteen years have gone by, and that mind numbing array of 64 penalties has now grown to over 150. If it was mind numbing in 1975, it has become mind boggling in 1989.

The present structure is a morass of inconsistency and irrationality that often discourages rather than encourages compliance in our tax system.

Under this system, a hapless taxpayer can find himself, or herself, confronting the Internal Revenue Code over a tax deficiency, where the penalties and interest have been piled on to the extent that they are twice the amount of tax in dispute. This sort of leverage has a highly negative effect over the tax process.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Last year on March 14, Congress began the long process of reforming the IRS penalty structure with a hearing before the Private Retirement Plans and Oversight of the Internal Revenue Service Subcommittee of the Senate Finance Committee.

At the same time the Senate Finance Committee began its work, the Oversight Subcommittee of the Ways and Means Committee began hearings on the subject of reforming the penalties of the Internal Revenue Code under the leadership of Chairman J.J. PICKLE. Additionally, the Internal Revenue Service, the General Accounting Office, the American Bar Association, and the American Institute of Certified Public Accountants all began independent studies of how to improve the penalty structure administered by the Internal Revenue Service.

In addition to these groups, I created a private sector task force representing many associations and perspectives. This group was cochaired by two very able individuals, Mr. Ken Gideon, now with the Treasury Department, and Mr. Jarold Cohen. The Senate owes these two gentlemen, as well as the entire task force, a debt of gratitude for the time they committed to this project. Mr. President, I ask unanimous consent to print a list of the members of the task force in the RECORD at the end of my statement.

A lot of very thoughtful people have spent a good deal of time thinking about this problem over the last 2 years. After 2 years of study and debate the various groups, task forces, and committees have developed a surprisingly similar philosophy on Internal Revenue Code penalty reform. This philosophy can be summarized in a number of short, simple rules for reform:

The amount of the penalty should be proportional to the culpability of the taxpayer. Under the present system, a taxpayer who is 1 day late pays the same penalty as a taxpayer who decides to never deposit payroll taxes.

The law should not allow the Internal Revenue Service to stack penalties for the same act of noncompliance. The IRS can now pick and choose among a host of penalties, or simply pile all available penalties on a taxpayer hoping to persuade him to negotiate.

Penalties should not discourage compliance with the tax laws. If a penalty is the same if a taxpayer is a little bit late or a lot late, taxpayers will always choose to be a lot late.

Whenever possible, waiver requirements should be standardized. The Internal Revenue Code presently contains many different standards for waiving penalties. The result is taxpayer confusion.

Similarly situated taxpayers should be treated similarly. Taxpayers are often confused to find they owe different penalty amounts for what are basically the same act of noncompliance.

Overlapping or redundant penalties should be eliminated. Rather than making changes to existing penalties that might not be working correctly, Congress has too often simply created an additional, redundant penalty for the same act.

Although a particular penalty may be correct in theory, if the Internal Revenue

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Service is unable to administer the penalty, it should not be in the Internal Revenue Code.

Penalties should be written clearly enough for taxpayers to understand the consequences of noncompliance. Because penalties have evolved over time, they are often difficult to understand. As a consequence of this vagueness, it is often difficult for taxpayers to know exactly what is the proper behavior.

Penalties should be tough enough to discourage noncompliance and to encourage noncompliant taxpayers to correct their actions.

The Internal Revenue Code Penalty Reform Act incorporates these simple premises into a rational penalty system, that is fairer and easier to administer. The bill consolidates all the various information requirements under one penalty. The new penalty is time sensitive: Penalizing a taxpayer who is 1 day late at a lower level than one who is 6 months late. It also creates a standard penalty waiver criteria, so a taxpayer does not have to learn many different standards to waive various penalties.

Most importantly, the bill repeals the ability of the IRS to stack penalties for the same offense. It also creates a rational three level accuracy penalty structure, that will punish noncompliant taxpayers based on the culpability of their actions.

The penalty structure created by this bill will make a fairer system. It will ensure that big time tax cheats will be punished. But at the same time it will protect the first time offenders who have made a mistake with our often complex tax laws. I look forward *S13899 to working with Chairman PICKLE on this important issue, and I commend him for his leadership on this legislation.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

PRIVATE SECTOR PENALTY TASK FORCE

CHAIRMAN

N. Jerold Cohen, Esquire, Southerland, Asbill and Brennan, Atlanta, GA.

MEMBERS

Mr. Jonathan Allen, Representing the American Banking Association, First Wachovia Corp., Winston-Salem, NC.

Ms. Patricia Burton, Representing the National Association of Enrolled Agents, Gles Ferry, Connecticut.

Tom Courtway, Esquire, Wright, Lindsey & Jennings, Little Rock, Arkansas.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

© 2004, Kleinrock Publishing

Code Secs. 6231, 6621, 9210

* Sec. 6231 Issues: Definitions and special rules -- (1) Partnership item; (2) Affected item.
* Sec. 6621 Issues: -- ; Tax motivated transaction.
* Sec. 9210 Issues: .

<<FULL TEXT>>

Field Service Advice

ISSUES

1. Whether the increased rate of interest on substantial underpayments of tax attributable to tax motivated transactions is a partnership item.

2. Whether the determination that the partnership engaged in a sham transaction must be made in the partnership proceeding.

3. Whether, for purposes of applying the increased rate of interest, partners who enter into a settlement of partnership items would be bound by a subsequent decision in the related TEFRA partnership case that the underlying partnerships engaged in sham transactions.

CONCLUSION

1. The increased rate of interest on substantial underpayments of tax attributable to tax motivated transactions is not a partnership item.

2. The determination that the partnership engaged in a sham transaction may be made in the partner-level proceeding.

3. For purposes of applying the increased rate of interest, partners who enter into a settlement of partnership items would not be bound by a subsequent decision in the related TEFRA partnership case that the underlying partnerships engaged in sham transactions. Nonetheless, the outcome of the TEFRA proceeding may have a strong impact on the determination of whether the underlying partnership engaged in a sham transaction in any subsequent action challenging the applicability of the increased rate of interest.

FACTS

With regard to a group of partnerships that are subject to the TEFRA unified audit and litigation procedures, the Service and several investors executed forms 870-P with regard to partnership items. None of the agreements expressly addressed the applicability of the increased rate of interest on the face of the form or the attached schedule of adjustments. Some investors received an attachment indicating that the increased rate of interest would apply. None of the agreements set forth the underlying basis for imposing the increased rate of interest.

LAW AND ANALYSIS

PLAINTIFF'S EXHIBIT 7

The sole issue for consideration is the applicability of the increased rate of interest. The resolution of this issue rests primarily upon the application of the TEFRA unified audit and litigation procedures to the settlements that have been executed in these related cases.

FORMER I.R.C. SECTION 6621(c) INCREASED INTEREST

Former section 6621(c) increased the interest rate to 120% of the statutory rate on substantial underpayments of tax that exceeded $1,000 that were attributable to "tax motivated transactions," as that term was defined in section 6221(c)(3). This provision was repealed for returns due after December 31, 1989 (without regard to extensions). Pub. L. No. 101-239, section 7721(b). The Code defined tax motivated transactions as:

Any valuation overstatement (within the meaning of former section 6659(c)),

Any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

Any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092),

Any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and

Any sham or fraudulent transaction.

The temporary regulations enumerate several accounting methods that might have resulted in a substantial distortion under section 6621(c)(3)(A)(iv). See Temp. Treas. Reg. section 301.6621-2T(A-3). Also, section 6621(c)(3)(B) authorized the Secretary to specify by regulation other types of transactions that would have been treated as tax motivated transactions. Temporary Treas. Reg. section 301.6621-2T(A-4) added the following:

Any deduction disallowed for any period under section 183, relating to an activity engaged in by an individual or an S corporation that is not engaged in for profit, and

Any deduction disallowed for any period under section 165(c)(2), relating to any transaction not entered into for profit.

The determination of whether the increased rate of interest applies is generally based upon the nature of the underlying transactions. For example, if the underlying transactions are determined to be "sham transactions," the increased rate of interest applies by operation of law. Durrett v. Commissioner, T.C. Memo. 1994-179. Similarly, the same result would be reached if it were determined that any of the specified prohibited accounting methods were used. The taxpayer's individual profit motive is irrelevant once it is determined that the transaction meets any of the specified criteria.

 © 2004, Kleinrock Publishing

By contrast, the increased rate of interest may be imposed based upon a partner's individual profit motive. Temp. Treas. Reg. section 301.6621-2T(A-4)(1). If the increased rate of interest is imposed based upon profit motive, the necessary inquiry looks at the intentions of the taxpayers. Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990). In Durrett, the Tax Court distinguished Heasley, noting that "[w]hen a transaction is the simple product of smoke and mirrors, it is a factual sham, regardless of whether the taxpayer may have thought that a profit might have been made." The court held that the determination that the transaction is a sham, without regard to profit motive, is sufficient to determine that the increased rate of interest applies. Durrett, citing H.R. Conf. Rep. No. 99-841 (1986), 1986-3 C.B. (Vol. 4) 796.

The ultimate issue in the present matter is whether the determinations that result in the application of the increased rate of interest must be made in accordance with TEFRA procedures. Such an inquiry necessarily focuses on the scope of the TEFRA provisions.

TEFRA GENERALLY

In 1982, Congress enacted the TEFRA <<ENDNOTE 1>> unified audit and litigation procedures to simplify and streamline the partnership audit, litigation, and assessment process. The underlying principle of TEFRA is that "the tax treatment of items of partnership income, loss, deductions, and credits will be determined at the partnership level in a unified partnership proceeding rather than separate proceedings with the partners." <<ENDNOTE 2>> Once partnership determinations become final, the Service and the partners are bound by those determinations. I.R.C. section 6230.

PARTNERSHIP ITEMS

With the enactment of TEFRA, Congress established a unified audit and litigation proceeding through which determinations as to partnership items are required to be made at the partnership level. I.R.C. section 6221. A partnership item is any item required to be taken into account by subtitle A for the partnership's taxable year to the extent it is determined by regulation that such item is more appropriately determined at the partnership level than at the partner level. I.R.C. section 6231(a)(3). The partnership aggregate and each partner's share of items of income, gain, loss, deduction and credit of the partnership are expressly defined by the regulations as partnership items. Treas. Reg. section 301.6231(a)(3)-1(a)(1)(i). In addition to those items that may be directly reported by the partnership, the regulations also state that partnership items include "factors that affect the determination of partnership items." Treas. Reg. section 301.6231(a)(3)-1(b). Such factors include the accounting practices of the partnership and whether the partnership is engaged in an activity for profit. Id.

For purposes of determining whether the increased rate of interest is a partnership item, the inquiry ends with the statutory definition of partnership items. Partnership items are limited to items required to be taken into account under any provision of subtitle A. As the Tax Court has succinctly stated, "Section 6621(c) is within subtitle F, not subtitle A. Therefore, section 6621(c) interest is not a 'partnership item' ..." Affiliated Equipment Leasing II v. Commissioner, 97 T.C. 575, 577-78

 © 2004, Kleinrock Publishing

(1991). Our inquiry, however, does not end there. In addition to partnership items, the preclusive effect of the TEFRA proceedings also applies to partnership-level determinations as to affected items. Smith v. Commissioner, T.C. Memo. 1990-510. Thus, though the increased rate of interest is not itself a partnership item, we must determine the extent to which it is impacted by partnership-level determinations.

AFFECTED ITEMS

An affected item is "any item to the extent such item is affected by a partnership item." I.R.C. section 6231(a)(5). The regulations clarify that affected items include "items unrelated to the items reflected on the partnership return." Temp. Treas. Reg. section 301.6231(a)(5)-1T. By definition, the tax treatment of affected items depends on partnership-level determinations. Maxwell v. Commissioner, 87 T.C. 783, 792 (1986).

In N.C.F. Energy Partners v. Commissioner, 89 T.C. 741 (1987), the Tax Court held that the increased rate of interest is an affected item of the type that may require findings of fact peculiar to the particular partner. One of the partnership item components is the deficiency that gives rise to the interest, in that the amount of the deficiency is determined by taking into account partnership items. Barton v. Commissioner, 97 T.C. 548, 551 (1991). The determination as to whether the partnership engaged in a tax motivated transaction, however, is not necessarily a partnership item. Affiliated Equipment Leasing II v. Commissioner, 97 T.C. 575, 579 (1991).

In Affiliated Equipment Leasing, the investors argued that the Tax Court had jurisdiction in the partnership-level proceeding to determine "whether an item is attributable to a tax motivated transaction" and that the applicability of the increased rate of interest would merely flow from the partnership item determination. The taxpayers argued that Treas. Reg. section 301.6231(a)(3)-1(b), which includes the character of an item in the definition of partnership items, includes the underlying determination of whether the increased rate of interest applies. The Tax Court rejected this argument.

Though not directly addressing the increased rate of interest, Smith v. Commissioner, T.C. Memo. 1990-510, is instructive on this point. In Smith, the taxpayer challenged, inter alia, the penalty for a substantial valuation overstatement. The Service issued an affected item notice of deficiency setting forth the substantial valuation overstatement penalty. The underlying basis for the penalty was the overvaluation of partnership property. The partnership had valued the property in excess of six million dollars; whereas the Service had issued a notice of final partnership administrative adjustment in which it was determined that the value of the property was zero. The valuation of the partnership asset was a necessary determination under subtitle A for purposes of computing the investment tax credit at the entity level and allocating that item to the partners. As a result, it was a partnership item under Treas. Reg. section 301.6231(a)(3)-1(b). Because the value of the property was a partnership item, petitioners were bound by the determination in the FPAA (from which no petition was filed). Thus, the substantial valuation overstatement penalty applied.

Similarly, for purposes of determining the applicability of the

increased rate of interest, to the extent subtitle A determinations are underlying components of the tax motivation inquiry, such determinations are partnership items. <<ENDNOTE 3>> As the Tax Court noted in Dial USA, Inc. v. Commissioner, however, the critical factor is whether the determination is required to be determined at the entity level. 95 T.C. 1, 4 (1990). As noted at the outset, the increased rate of interest may be imposed under a variety of circumstances. Whether the components that underlie the application of the increased rate of interest are partnership items must be determined in light of the applicable definition of tax motivation.

PARTNERSHIP ITEM COMPONENTS OF TAX MOTIVATION

As noted at the outset, the increased rate of interest may be imposed under a variety of circumstances. Those circumstances constitute the underlying basis for imposing the increased interest. Whether the underlying basis for imposing the increased rate of interest is a partnership item will depend upon whether it is required to be determined by the partnership under subtitle A.

One example is the imposition of the increased rate of interest when there is a valuation overstatement within the meaning of former section 6659(c). In Smith v. Commissioner, T.C. Memo. 1990-510, the Tax Court held that underlying components of the substantial valuation overstatement penalty are partnership items (specifically, the value placed on the asset by the partnership and the actual value of the asset). Those same items are components of the tax motivation determination under former section 6621(c)(3)(A)(i). Thus, to the extent those components must be determined in the partnership proceeding for purposes of determining the adjustment to items that are required to be taken into account under subtitle A, those items must also be determined in the partnership proceeding for purposes of determining the applicability of increased interest.

As applicable to this case, a sham or fraudulent transaction may also give rise to the imposition of the increased rate of interest. If it is determined that the partnership engaged in sham transactions resulting in the adjustment of partnership items, such an adjustment will automatically give rise to the imposition of the increased rate of interest; however, the sham determination is only a partnership item to the extent it must be determined in the partnership proceeding for purposes of determining the adjustment to items that are required to be taken into account under subtitle A. See Treas. Reg. section 301.6231(a)(3)-1(b).

THE PRESENT SITUATION

In the above examples, we concluded that a determination at the partnership level that a transaction or the partnership as a whole met one of the criteria specified in section 6621(c)(3) results in the automatic application of the increased rate of interest. In the present situation, however, the partners executed forms 870-P that were silent as to the application of the increased rate of interest and did not expressly indicate the underlying basis for imposing the increased rate of interest. In some instances, those determinations may be required to be made under subtitle A. This occurs when the issues underlying the resulting deficiency involve those same subtitle A determinations. Absent such a required subtitle A determination, tax motivation is not required to be

determined at the entity level. Affiliated Equipment Leasing, 97 T.C. at 577-78; Dial, 95 T.C. at 4. The confusion arises because the tax motivation underlying the application of the increased rate of interest is inextricably interwoven with the underlying merits of the partnership proceeding. Nonetheless, unless the tax motivation criteria is a require subtitle A determination, it is not a partnership item. Affiliated Equipment Leasing, 97 T.C. at 577-78.

In the instant case, the partnership item adjustments set forth in the FPAAs were based on the Commissioner's determination that the partnerships engaged in a sham transaction. Some partners entered into settlements that are silent on the sham issue. Because the determination that the partnership engaged in a sham transaction is not a determination required under subtitle A, the absence of such a determination is not fatal to its assertion.

Unlike the substantial valuation overstatement penalty, which requires subtitle A determinations, a determination that a transaction is a sham is not required to be taken into account under subtitle A. Furthermore, the assertion that the partnership engaged in a sham transaction is consistent with the FPAAs issued in this case. Accordingly, the determination that the partnership engaged in a sham transaction is not a partnership item.

We recognize that the sham determination is akin to a partnership item in that it may be determined in the partnership proceeding and binding on all partners, and that such a partnership-level determination would be consistent with the objectives of TEFRA to reduce duplicative proceedings. As the Tax Court stated in N.C.F. Energy Partners, 89 T.C. at 746-47:

> We appreciate petitioner's concern for avoiding repetitive litigation. We doubt, however, that the litigation will be repetitive; it has been organized by statute to avoid chaotic and disparate results. Any future litigation at the partner level will not be repetitive of the partnership level proceeding. The doctrine of res judicata will apply to preclude the parties from relitigating any issue already resolved in the partnership proceeding, for example, the value or basis of partnership assets.

In focusing on the principles of res judicata (or what should more properly be characterized as collateral estoppel), the Tax Court clarified how determinations made in a partnership proceeding, such as the determination that a partnership is a sham, may be binding on the partners without necessarily being a partnership item. A partner is generally a party to the TEFRA proceeding, and thus is precluded from relitigating issues that were determined in the prior proceeding even absent the statutory provisions regarding finality as to partnership items.

In sum, the determination that a partnership engaged in a sham transaction for purposes of imposing the increased rate of interest on substantial underpayments of tax attributable to tax motivated transactions is an affected item, not a partnership item. This is consistent with those cases which have held that we look to the partnership proceeding to determine whether the facts lead to the conclusion that the tax motivation inquiry is satisfied, because though not a partnership item, partners may be collaterally estopped from challenging a determination in a TEFRA proceeding that the partnership engaged in a sham transaction. <<ENDNOTE 4>>

© 2004, Kleinrock Publishing

As a secondary issue, you have inquired whether a subsequent determination in a TEFRA proceeding that the partnership engaged in a sham transaction would be binding on partners who had previously entered into a settlement. Section 6231(b)(1)(C) provides that partnership items convert to nonpartnership items when the partner enters into a settlement agreement. Once the partner's partnership items convert to nonpartnership items, the partner is no longer a party to the TEFRA proceeding. I.R.C. section 6226(d)(1)(A). Accordingly, the partner is not bound by the outcome of the proceeding. As noted by the Court of Federal Claims, "the value or treatment of the items in the hands of the individual partner is determined solely by the terms of the settlement agreement and the taxpayer's own circumstances, and not by any subsequent tax determination with respect to the partnership." Slovacek v. United States, 36 Fed. Cl. 250, 255 (1990).

Though the partner is not bound to the outcome of the TEFRA proceeding, the TEFRA proceeding may, from a practical standpoint, be determinative of the outcome as to the issue of the increased rate of interest. For example, in the plastics recycling cases, the Tax Court held that certain transactions were shams and applied the substantial overvaluation penalty. See Provizer v. Commissioner, T.C. Memo. 1992-177. Though petitioners in related cases generally signed agreements to be bound, not all partners agreed to be bound to the outcome of Provizer. Nonetheless, rather than revisiting the underlying issues, the Tax Court often cited to the opinion in Provizer and where the parties failed to distinguish the facts, the court based its decision upon the holding in Provizer. See e.g., Sann v. Commissioner, T.C. Memo 1997-259. A similar result is likely here. There are numerous partnerships with an identical structure, and there are thousands of partners. If the Tax Court were to hold in the TEFRA proceeding that the partnership engaged in a sham transaction, that opinion would be influential, though not binding, in any other proceeding.

CASE DEVELOPMENT, HAZARDS AND OTHER CONSIDERATIONS

____.

If you have any further questions, please call (202) 622-7880.

<<ENDNOTES>>

1/ Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248.

2/ H.R. Conf. Rep. No. 97-760, at 600 (1982), 1982-2 C.B. 600, 662.

3/ An example of the partnership item component approach to affected items commonly occurs with regard to basis determinations. See, e.g., University Heights at Hamilton Corp. v. Commissioner, 97 T.C. 278 (1991) (addressing S corporation-level determinations as components of basis, which is an affected item).

4/ Likewise, the Service may similarly be estopped from arguing in a later proceeding that the partnership engaged in a sham transaction if it is determined in the TEFRA proceeding that the partnership did not engage in a sham transaction.

© 2004, Kleinrock Publishing

Deborah A. Butler
Assistant Chief Counsel
(Field Service)

By: ______
Henry S. Schneiderman
Technical Assistant to the Assistant
Chief Counsel (Field Service)

<<END RULING>>

Form **870-L (AD)** (March 1993)

Department of the Treasury — Internal Revenue Service

# Settlement Agreement for Partnership Adjustments and Affected Items

*(See instructions)*

| Taxpayer(s) name(s), address, and zip code | Name of Partnership | Tax Year(s) Ended |
|---|---|---|
| | Taxpayer Identifying Number: | |
| Taxpayer Identifying Number: | Name of Partnership Contact Person | |

## Part I: Offer of Settlement of Partnership Items

Under the provisions of section 6224(c) of the Internal Revenue Code, the Commissioner of Internal Revenue and the undersigned taxpayer(s) agree to the determination of partnership items as shown on the attached schedule of adjustments.

The undersigned taxpayer(s), in accordance with section 6224(b), also waives the restrictions on assessment and collection of any deficiency attributable to partnership items (with interest as required by law) provided in section 6225(a).

This agreement is conditional, and will not become effective or final until this agreement form is returned to the Commissioner of Internal Revenue and is signed on his or her behalf. The one year extension of the period of limitations on assessment under section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf.

If this agreement form is signed for the Commissioner, the treatment of partnership items under this agreement will not be reopened in the absence of fraud, malfeasance, or misrepresentation of fact; and no claim for an adjustment of partnership items or for a refund or credit based on any change in the treatment of partnership items may be filed or prosecuted.

| Signature of taxpayer | Date |
|---|---|
| Signature of taxpayer | Date |
| By (Signature and title) | Date |

## Part II: Offer of Settlement of Affected Items

Under the provisions of sections 6224(c) and 7121 of the Internal Revenue Code, the Commissioner of Internal Revenue and the undersigned taxpayer(s) agree to the determination of partner level determinations (affected items). These items:

(1) limit the amount of partnership item deductions or credits at the partner level pursuant to sections 704(d), 465 or 469 of the Code, as set forth in the attached schedule of adjustments, and/or

(2) are additions to tax, and interest under section 6621(c) of the Code, as shown on the attached schedule of adjustments.

The undersigned taxpayer(s), in accordance with sections 6224(b) and 6213(d), also waives the restrictions provided by sections 6230(a) and 6213(a) of the Code and consents to the assessment and collection of tax attributable to the application of sections 704(d), 465 or 469 of the Code, and any additions to tax, and interest under section 6621(c), as set forth in the attached schedule of adjustments; plus any interest provided by law.

This agreement is conditional, and will not become effective or final until this agreement form is returned to the Commissioner of Internal Revenue and is signed on his or her behalf. The one year extension of the period of limitations on assessment under section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf.

If this agreement form is signed for the Commissioner, the treatment of the specified affected items under this agreement will not be reopened in the absence of fraud, malfeasance, or misrepresentation of fact; and no claim for an adjustment to these affected items or for a refund or credit based on any change in the treatment of these affected items may be filed or prosecuted.

This agreement with respect to affected items is not subject to a request for consistent settlement pursuant to section 6224(c)(2).

| Signature of taxpayer | Date |
|---|---|
| Signature of taxpayer | Date |
| By (Signature and title) | Date |

**For Internal Revenue Use Only**

| Date accepted for Commissioner | Signature |
|---|---|
| Office | Title |

PLAINTIFFS' EXHIBIT 8

**Instructions for signing the settlement agreement:**

1. Sign Part I (Offer of Settlement of Partnership Items) to settle the partnership items as shown on the attached schedule of adjustments.
2. Sign Part II (Offer of Settlement of Affected Items) to settle the items that require partner level determinations (affected items). These items are also shown on the attached schedule of adjustments.

   If you don't sign Part II, we will mail you one of the following:

   ▶ An affected item report showing the adjustments to your return. You can agree to the affected items at that time or request further Appeals consideration. The report will explain how to do this.

   ▶ A notice of deficiency which tells you how to file a petition to the United States Tax Court.
3. The settlement of the partnership items in Part I will remain the same whether or not you sign Part II.
4. If a JOINT RETURN OF A HUSBAND AND WIFE was filed, both spouses must sign, unless one spouse, acting under a power of attorney, signs as agent for the other.
5. If you are a corporation, the officer authorized to sign must sign with the corporate name followed by his or her signature and title.
6. Your attorney or agent may sign either Part I or Part II provided we have received a power of attorney, which if not previously filed, must accompany this form.

Department of the Treasury — Internal Revenue Service

# Settlement Agreement for Partnership Adjustments and Affected Items

## Schedule of Adjustments

| Name of Partnership | Tax Year(s) Ended | | |
|---|---|---|---|
| Taxpayer Identifying Number: | | | |
| Detail of Adjustments to Ordinary Income | | | |
| Total Adjustments to Ordinary Income | | | |
| Other Adjustment: | | | |
| (1) Adjustment | | | |
| (2) As Reported | | | |
| (3) Corrected | | | |
| Other Adjustment: | | | |
| (1) Adjustment | | | |
| (2) As Reported | | | |
| (3) Corrected | | | |

Remarks

Form 906 Department of the Treasury—Internal Revenue Service
(Rev. August 1994)

# Closing Agreement On Final Determination Covering Specific Matters

Under section 7121 of the Internal Revenue Code ________________________________

________________________________________________

(Taxpayer's name, address, and identifying number)

________________________________________________

and the Commissioner of Internal Revenue make the following closing agreement:

SAMPLE

SAMPLE

PLAINTIFFS' EXHIBIT
9

This agreement is final and conclusive except:

(1) the matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of material fact;
(2) it is subject to the Internal Revenue Code sections that expressly provide that effect be given to their provisions (including any stated exception for Code section 7122) notwithstanding any other law or rule of law; and
(3) if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.

**By signing, the above parties certify that they have read and agreed to the terms of this document.**

Your signature____________________ Date Signed__________

Spouse's signature (if a joint return was filed)____________________ Date Signed__________

Taxpayer's representative____________________ Date Signed__________

Taxpayer (other than individual)____________________

SAMPLE

By____________________ Date Signed__________

Title____________________

Commissioner of Internal Revenue

By____________________ Date Signed__________

Title____________________

SAMPLE

I have examined the specific matters involved and recommend the acceptance of the proposed agreement.

(Receiving Officer) (Date)

(Title)

I have reviewed the specific matters involved and recommend approval of the proposed agreement.

(Reviewing Officer) (Date)

(Title)

SAMPLE

SAMPLE

Form **906** (Rev. 8-94)